**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

———————————————————————

J.B., by and through his next friend,
Frances Boylan; J.D.; D.F., by and through his
next friend, Debbie Marion; on behalf of
themselves and all persons similarly situated;                    Case No.:

Plaintiffs,

v.

WANSLEY WALTERS, in her official capacity
as Secretary of the Florida Department of
Juvenile Justice; MICHAEL CANTRELL, in
his official capacity as Operations and Program
Manager of the North Florida Youth
Development Center; and TEION WELLS
HARRISON, in her official capacity as the
Designated Mental Health Authority of the
North Florida Youth Development Center;

Defendants.

———————————————————————

**COMPLAINT**
**(CLASS ACTION)**

**INTRODUCTION**

1.      This is a class action brought on behalf of all youth with mental illness and

developmental disabilities who are adjudicated delinquent and in the custody of the North

Florida Youth Development Center (NFYDC), a juvenile facility in Marianna, Florida, that is

owned and operated by the State of Florida.  Formerly known as the Arthur G. Dozier School for

Boys, the facility has a notorious history of abusive and unsafe conditions and has been the

subject of investigations, litigation and public scrutiny.  Although the facility's name has

changed, the attempts to fix these persistent problems have not stopped Defendants from reverting to patterns of unconstitutional conduct.

2.      Defendants subject youth with mental illness and developmental disabilities at the NFYDC to abusive and unsafe conditions of confinement, including the denial of appropriate mental health treatment and a pattern and practice of the use of punitive isolation, restraints and force in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  Defendants also violate Plaintiffs' due process rights by failing to provide reasonably safe conditions of confinement.  Defendants also enforce policies which deny youth their rights to minimally adequate programming.  Defendants' conditions, policies and practices at the NFYDC constitute punishment and are a substantial departure from accepted professional judgment, practices and standards in violation of Plaintiffs' rights to rehabilitative treatment under the Due Process clause to the Fourteenth Amendment of the United States Constitution.

3.      Plaintiffs bring this action to redress the violations of their civil and constitutional rights by Defendants while acting under color of state law.  The conditions at NFYDC, and the policies and practices of Defendants, harm Plaintiffs' physical health and safety, are detrimental to Plaintiffs' emotional and psychological well being, and deprive Plaintiffs of their constitutional rights.

4.      All Plaintiffs, individually and on behalf of the alleged Plaintiff class, seek declaratory and injunctive relief requiring Defendants to cease their unlawful policies and practices.

## JURISDICTION AND VENUE

5.      Plaintiffs' claims for relief are predicated upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights privileges and immunities secured by the Constitution and laws of the United States.  This action seeks injunctive relief and damages pursuant to 42 U.S.C. § 1983 for injury to Plaintiffs' Fourteenth Amendment rights.

6.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) & (4).

7.      Venue is proper in the Northern District of Florida pursuant to 28 U.S.C. § 1391(b) because at least one of the Defendants resides in this District and a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

**PLAINTIFFS:**

8.      Plaintiff J.B. is 17 years old and confined at the "Closed Campus" side of the NFYDC.  He was 16 years old when he was adjudicated delinquent and was sent to the NFYDC on March 1, 2010.  J.B. has been diagnosed by the psychiatrist at NFYDC with psychotic disorder, conduct disorder, speech disorder, substance abuse and borderline cognitive functioning.  He has been prescribed several different medications for his mental illness while at NFYDC.

9.      Plaintiff J.D. is 18 years old and confined at the "Closed Campus" side of the NFYDC.  He was 16 years old when he was adjudicated delinquent and was sent to the NFYDC on August 25, 2009.  J.D. has been diagnosed by the psychiatrist at NFYDC with major depression with psychotic features and suicidal ideation, conduct disorder, anxiety disorder,

substance abuse/dependence and Attention Deficit Hyperactivity Disorder (ADHD).  He has been prescribed several different medications for his mental illness while at NFYDC.

10.     Plaintiff D.F. is 18 years old and confined at the "Open Campus" of NFYDC.  He has been at the NFYDC since October 26, 2010.  D.F. has been diagnosed by the psychiatrist at NFYDC with major depression with psychotic features, conduct disorder and mild mental retardation. He has been prescribed medications for his mental illness while at NFYDC.  Prior to treatment at NFYDC, D.F. had a history of mental health treatment and had been diagnosed with depressive disorder (NOS), disruptive behavior disorder (NOS), psychotic disorder (NOS), mild mental retardation and ADHD.  In the community, he was receiving counseling services, taking psychotropic medications and had several involuntary psychiatric commitments which were related to auditory and visual hallucinations and suicidal thoughts.  D.F. has a full scale IQ of 58.

11.     Plaintiffs J.B. and D.F. sue through their Next Friends who are their parents and adult citizens of the State of Florida.

12.     Named Plaintiff D.F. has brought this action through his parent and Next Friend, Debbie Marion, due to his intellectual disability in order to assist him in understanding the proceedings and to represent his interests.

**DEFENDANTS:**

13.     Defendant Wansley Walters (Walters) is the Secretary of the Florida Department of Juvenile Justice (DJJ).  She is sued in her official capacity for her actions as Secretary.  As DJJ Secretary, she is responsible for "planning, coordinating, and managing the delivery of all programs and services within the juvenile justice continuum," which includes all detention centers and related programs and facilities, community-based residential programs, non-residential programs and all delinquency institutions funded by the department.  § 20.316(1)(b),

Fla. Stat. (2010).  Secretary Walters is required to "[e]nsure that juvenile justice continuum

programs and services are implemented according to legislative intent; state and federal laws,

rules and regulations; statewide program standards; and performance objectives," "establish

program policies and rules" and "coordinate staff development and training."  §§

20.316(1)(c)(1), (4) & (6), Fla. Stat.

14.     Defendant Michael Cantrell (Cantrell) is the Operations and Program Manager of

the NFYDC.  He is sued in his official capacity.  Defendant Cantrell is responsible for the daily

operation of the program, as well as ongoing program planning and evaluation to ensure the

safety, security and effectiveness of the services provided to all youth at the NFYDC.  Rule 63E-

7.016(1), Fla. Admin. Code (2009).   He directly supervises, trains and disciplines all NFYDC

facility staff.  He is responsible for the development and implementation of all NFYDC policies

and procedures at the NFYDC which include "a code of conduct for staff that clearly

communicates expectations for ethical and professional behavior, including the expectation for

staff to interact with youth in a manner that promotes their emotional and physical safety."  Rule

63E-7.016(4)(i), Fla. Admin. Code.

15.     Defendant Teion Wells Harrison (Harrison) is the Designated Mental Health

Authority of the NFYDC and a licensed psychologist.  She is sued in her official capacity.  As

the Designated Mental Health Authority, she is designated as accountable to Defendants Cantrell

and Walters for ensuring appropriate coordination and implementation of mental health and

substance abuse services at the NFYDC.  Rule 63E-7.002(23), Fla. Admin. Code. On

information and belief, as the Designated Mental Health Authority at the NFYDC, Defendant

Harrison performs the following duties:  provides oversight of all aspects of the mental health

treatment and substance abuse programs, including, but not limited to, the NFYDC mental health

and substance abuse treatment program; provides clinical supervision to all staff that provide counseling and mental health services to youth at the NFYDC; assists the Director of the NFYDC mental health and substance abuse treatment program with the maintenance of policies and procedures to meet the Department of Juvenile Justice's Quality Assurance review standards; coordinates and implements the development and evaluation of the mental health, substance abuse treatment programs and other mental health services; provides crisis intervention assessment and evaluation for youth at the NFYDC; and performs other duties related to the mental health services provided to youth at the NFYDC.

16.     At all times relevant to this Complaint, Defendants were acting under color of state law.

## CLASS ACTION ALLEGATIONS

17.     Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), the named Plaintiffs bring this action on behalf of themselves and all other persons similarly situated.

18.     The proposed class consists of all youth with mental illness and/or developmental disabilities (including borderline developmental disabilities) who are confined at the NFYDC and receiving services through the NFYDC Specialized Treatment Program, or, who are in need of such services.

19.     <u>Numerosity</u>:  The Plaintiff class is so numerous that joinder of all its members is impracticable.  On information and belief, there are currently over 100 class members at NFYDC.  Approximately 195 male youth were released from the NFYDC in fiscal year 2008-09. Youth remain at the NFYDC for varying lengths of time and the population changes on a daily basis.  The class also includes future members whose names are not known pursuant to Fed. R. Civ. P. 23(a)(1).

20.     <u>Commonality</u>:  There are questions of law or fact that are common to all named

Plaintiffs, as well as to all putative class members: Whether Defendants have violated the Due

Process Clause to the Fourteenth Amendment to the United States Constitution through their

failure to provide class members with reasonably safe conditions, freedom from unreasonable

bodily restraint and failure to provide rehabilitative treatment.

21.     <u>Typicality</u>:  The claims of the named Plaintiffs are typical of the claims of the

class as a whole.

22.     <u>Adequate representation</u>:  The named Plaintiffs will fairly represent and

adequately protect the interests of members of the class as a whole.  The named Plaintiffs do not

have any interests antagonistic to those of other class members.  By filing this action, the named

Plaintiffs have displayed an interest in vindicating their rights, as well as the claims of others

who are similarly situated.  The relief sought by the named Plaintiffs will inure to the benefit of

members of the class generally.  The named Plaintiffs are represented by counsel who are skilled

and knowledgeable about civil rights litigation, prison law, practice and procedure in the federal

courts and the prosecution and management of class action litigation.

23.     Defendants have acted or refused to act on grounds generally applicable to the

class, thereby making final injunctive and declaratory relief appropriate with respect to the class

as a whole under Fed. R. Civ. P. 23(b)(2).  Defendants' policies and practices have violated the

rights of all class members, including violating the constitutional rights of Plaintiffs J.B., J.D.

and D.F..  A class action is superior to individual lawsuits for resolving this controversy.

## STATEMENT OF FACTS

24.     The Florida juvenile justice system is operationally and philosophically distinct

from the adult criminal justice system and manages youth under a strategy of redirection and

rehabilitation, rather than punishment.  Florida's juvenile system focuses on a rehabilitation model of treatment designed to effect positive behavioral change.  Youth who are adjudicated delinquent can be committed to DJJ state owned and privately contracted facilities for long-term supervision, custody, care and treatment.  *See* § 985.03(15)(a), Fla. Stat.  The programming provided varies from facility to facility.  DJJ facilities vary from low to maximum risk in the level of security provided.

25.     The NFYDC is a 151 bed "high risk" and "maximum risk" juvenile facility for male youth between 13 and 21 years old.  NFYDC is operated by the State of Florida and is comprised of three areas: the Open Campus, Closed Campus and the Developmentally Disabled/Borderline Developmentally Disabled (DD/BDD) Program within the Open Campus.

26.     The NFYDC Open Campus, formerly known as the Arthur G. Dozier School for Boys (Dozier), houses the "high risk" side of the facility.  The NFYDC Closed Campus, formerly known as the Jackson Juvenile Offender Correctional Center (JJOCC), houses the "maximum risk" side of the program and also houses "high risk" youth based on decisions by the facility administration.

27.     The length of stay at NFYDC for the Open Campus and the DD/BDD Program is supposed to average between 9 to 12 months.  The length of stay at NFYDC for the Closed Campus is supposed to average between 18 and 36 months.  However, youth can remain at the facility well past these average lengths of stay.

28.     The authority of the Secretary of DJJ, Defendant Walters, includes the final authority to take any necessary corrective action concerning a DJJ program or provider.  *See* § 985.632(5)(f)(2), Fla. Stat.

29.     According to DJJ's own quality assurance standards, the NFYDC provides unsafe conditions for youth and has consistently operated at failing levels for juvenile facilities in the areas of: healthcare, youth safety and security, case management and delinquency intervention, management accountability and mental health/substance abuse.

30.     Defendant Walters and Cantrell are responsible for ensuring that the NFYDC operates in compliance with state and federal law.  Despite this requirement, Defendant Walters has allowed Defendants Cantrell, Harrison and the NFYDC to violate the rights of youth by subjecting them to harmful and unconstitutional conditions and violating their due process rights.

## Failure to Provide Rehabilitative Treatment

31.     Youth with disabilities are overrepresented in the juvenile justice system. According to estimates, 70% of youth committed to facilities such as NFYDC have a mental illness or substance abuse issue.

32.     Youth at the NFYDC have childhood histories of abuse, trauma, substance abuse, emotional abuse, diagnosed psychiatric conditions and learning disabilities.

33.     For youth to receive adequate mental health treatment, they must be provided with an adequate treatment plan to guide their care.  Defendants fail to develop and implement adequate, comprehensive and coordinated treatment plans for youth with mental illness and/or developmental disabilities, including Plaintiffs and similarly situated youth.

34.     Defendants fail to provide adequate mental health treatment for the named Plaintiffs and similarly situated youth.  Defendants have developed so-called "Individualized" Mental Health/Substance Abuse Treatment Plans which contain boilerplate, generalized, simplistic, vague treatment goals and objectives which are merely repeated on the monthly treatment plans for Plaintiffs and members of the putative class.  Defendants fail to review and

modify treatment for Plaintiffs, and members of the putative class, based on any objective assessment of their progress, changes in rehabilitative needs and learning more about each youth. Each of the Plaintiffs' Individualized Mental Health/Substance Abuse Treatment Plans (treatment plans) includes goals which remain the same even though their circumstances and treatment needs change.  NFYDC counselors also fail to conduct group and individual counseling sessions with Plaintiffs, and members of the putative class, as specified in their treatment plans.

35.    Plaintiff J.B. has engaged in multiple acts of self-injurious behavior and has experienced auditory hallucinations while at the NFYDC.  J.B. has been placed on suicide risk observation at least 20 times for periods ranging from a few days to over a month.  Despite these serious signs of mental distress, his treatment plan does not include any specific objectives and interventions to address these specific instances and behaviors even during months where he was placed on suicide observation or required medical attention because of physically injuring himself or attempting to do so.

36.    During his initial mental health intake at the NFYDC in March 2010, Plaintiff J.B. was identified as a victim of child sexual abuse and received a DSM-IV diagnosis related to this history.  J.B.'s initial treatment plan also identified that he needed psychological testing to address whether treatment objectives and interventions should be developed related to his reported symptoms of Post-Traumatic Stress Disorder (PTSD) and Attention Deficit Hyperactivity Disorder (ADHD).  Defendants took months to complete any testing concerning J.B.'s PTSD and ADHD symptoms.  Although the testing identified that J.B.'s treatment should be modified to address significant trauma related to childhood sexual abuse, witnessing a

shooting and symptoms of ADHD, Defendants have never modified his treatment plan to include

any strategies or goals to address these issues.

37.     Although J.B. has continued to experience significant behavioral issues while at

the NFYDC, Defendants have never developed any functional behavioral analysis concerning

these behaviors or engaged the NFYDC staff or mental health staff in any behavioral plan as part

of J.B.'s treatment.

38.     Instead of providing adequate psychiatric services and rehabilitative treatment

when J.B. has engaged in self-harm or acted out, Defendants have punished Plaintiff J.B.'s

behaviors by placing him in isolation at least 26 times ranging from a few hours to several days,

intentionally using unnecessary and excessive force against him, applying arm and leg restraints

on multiple occasions for an hour at a time and labeling him as continuing to engage in "aberrant

behavior."

39.     As a result of Defendants' failure to provide adequate mental health treatment,

and their continued use of isolation, restraints and force against J.B., he has engaged in

additional acts of self-injury during his confinement at the NFYDC.  He has also experienced an

increase in pre-existing trauma and insomnia, mental distress and depression.  Defendants'

failure to provide appropriate treatment has also resulted in J.B. experiencing increased anxiety

which has caused physical sickness, including vomiting and indigestion problems requiring a

liquid diet.

40.     While at the NFYDC, Plaintiff J.D. has engaged in multiple acts of self-harming

behavior which have required hospitalization and medication attention.  J.D. has also

experienced hallucinations that started shortly after he arrived at the NFYDC in August 2009.

These hallucinations direct J.D. to hurt himself and others.  Plaintiff J.D. has been placed on

suicide risk observation approximately 17 times for periods ranging from a few days to over a month.  J.D. began being placed on suicide risk observation the month that he arrived at the NFYDC and was rarely off suicide risk observation until early January 2010 when these placements became less frequent.

41.     Despite these serious signs of mental distress, Defendants have failed to include any specific objectives and interventions in J.D.'s treatment plan to adequately address these specific instances and behaviors even during months where he was hospitalized, or was on suicide observation for extended periods of time because of physically injuring himself or vocalizing thoughts about doing so.  It was not until August 2010 that Defendants even added an objective in J.D.'s treatment plan which recognized that J.D. was engaging in self-harm. This objective failed to address any of the very serious behaviors that had preceded it and proved to be ineffective.  After August 2010, J.D. continued to engage in self-injury, including ingesting foreign objects such as rocks.  In response, Defendants continued to place him on suicide observation and made no revisions to his treatment.

42.     As a result of Defendants' failure to provide adequate mental health treatment, J.D. has experienced physical harm, trauma, anxiety, insomnia, mental distress and depression.

43.     Plaintiff D.F. has a developmental disability and mental illness that require accommodations in staff interactions and instructions.  His disabilities also make him particularly vulnerable to physical abuse and victimization by other youth.

44.     Defendants employ no behavioral plans, functional behavioral analysis or strategic interventions for youth with developmental disabilities, including Plaintiff D.F., that are targeted to particular cognitive limitations, behavioral issues and treatment needs.

45.     D.F.'s cognitive deficits often result in him having confrontations with other youth.  Defendants have failed to address D.F.'s altercations with other youth as part of his behavioral needs and as related to his disabilities.  D.F. is frequently taunted, harassed and physically assaulted by other youth and in one recent incident, his nose was broken by another youth. In addition, D.F.'s altercations with other youth often result in the use of force against him by staff.  When D.F. is involved in altercations with other youth, he has problems comprehending staff instructions because of his disabilities.  Defendants fail to address these incidents and issues as related to D.F.'s disabilities and as part of an appropriate behavior management plan and treatment.

46.     Defendants have also failed to train staff in proper de-escalation and other behavioral intervention techniques when dealing with D.F., and similarly situated youth. Instead, Defendants subject D.F. to discipline and punishment for behavior that is directly related to and a manifestation of his disabilities.

47.     In lieu of appropriate behavioral and mental health treatment for D.F.'s intellectual disability and mental illness, Defendants punish D.F. and place him into isolation for hours and days.  As a result of Defendants' failures, Plaintiff D.F. has suffered physical and emotional injury from physical assaults by youth and staff, from the use of punitive isolation and because of a constant fear that he will be subjected to further physical assaults and punishment. He has also suffered humiliation, anxiety and depression.

48.     Defendants' policy, practice and/or custom of failing to provide youth with mental illness and developmental disabilities with adequate mental health treatment as described herein is a substantial departure from accepted professional judgment, practice or standards.

Defendants' actions and inactions deprive Plaintiffs, and similarly situated youth, of their right to treatment and rehabilitation.

49.     Defendants' failure to provide adequate rehabilitative treatment to the named Plaintiffs, and members of the putative class, has resulted in an increase in their physical and psychological harm, including: self-injurious behaviors, anxiety, insomnia, loss of appetite, physical injury, trauma, fear, illness, depression and reduce the likelihood of successful reintegration into the community.

<u>**Punitive Conditions – Use of Isolation, Restraints and Force**</u>

50.     Defendants punish the named Plaintiffs, and similarly situated youth, by confining them for extended periods of time in isolation.

51.     Defendants use isolation to impose punishment for youth with mental illness and/or developmental disabilities for conduct such as carving into their bodies, ingesting foreign substances, banging their heads against their room doors or walls, "mouthing off" to staff, making inappropriate uses of their feces or urine, refusing to follow staff instructions, defending themselves from physical attacks by other youth where staff fail to intervene, attempting and engaging in self-harm or vocalizing suicidal thoughts.   Solitary confinement in isolation is imposed in lieu of appropriate mental health counseling and other therapeutic programming and treatment that youth with mental illness and developmental disabilities, including those at risk for suicide or who engage in self-injury, should receive.

52.     Defendants also violate Plaintiffs' due process rights by confining them in isolation as punishment for certain specified offenses and for reasons related to their mental illness.  Defendant Cantrell developed and authorized a NFYDC Youth Handbook which informs youth that certain offenses warrant immediate placement into isolation: physically

assaulting another youth or staff member; leading, directing, or inciting other youth to riot or escape; attempting to escape (or escaped and is back at the program); inflicting major property destruction; and repeatedly violating rules of the program.  The NFYDC handbook also requires youth to be placed in isolation to prevent self-injury.  The policies in this handbook are applicable to all members of the putative class.

53.     Mental health professionals do not participate in decisions to place youth into isolation, or examine youth before, during or after the use of isolation.

54.     Youth placed into isolation are segregated in a special confinement area from the general population and deprived of regular programming.  The main activities of youth placed in isolation are eating, sleeping and idle sitting.  Youth in isolation do not attend the NFYDC academic school program, do not participate in group or individual counseling as specified in their individualized mental health treatment plans, are generally denied reading materials, are generally not permitted any physical exercise or recreation, and cannot participate in vocational training programs.  Youth must request to be escorted by staff to use a bathroom and are also taken to their 5 minute shower by staff.

55.     The isolation rooms at the NFYDC are stark and contain only a slab with a mattress and sheet.  If a youth is placed on any type of observation for suicide risk while in isolation, his mattress is removed from his cell during the day and only provided at night (without a sheet) when it is placed in the doorway of the cell for him to sleep on.

56.     On information and belief, the putative class members are regularly subjected to placement in isolation at NFYDC for time periods ranging from a few hours to weeks.

57.     Once in isolation, staff further traumatize youth with mental illness and developmental disabilities, including Plaintiffs and members of the putative class, by using

unnecessary and excessive physical force.  Youth in isolation are targeted for the excessive use of force for self-harm or behavior such as crying out or striking the cell walls or doors with their hands or heads.  In response to such behavior, staff routinely use force to physically restrain youth under them on the ground, pinning them down on their stomachs and binding youth in mechanical restraints by the hands and feet with metal handcuffs and legcuffs. The use of these restraints immobilizes the youth and places them in positions which increase the risk for asphyxiation. Such practices subject youth to physically dangerous conditions, violate their right to freedom from undue restraint and are a substantial departure from accepted professional judgment, practices and standards.

58.     Plaintiff J.B. was placed into isolation at least 26 times for reasons that lack any legitimate objectives or rehabilitative purpose related to treatment. Defendants confined J.B. to isolation for reasons such as: multiple instances for engaging in physical self-harm, including choking himself, hitting his head against doors; hitting walls with his hands; ingesting objects; cutting himself; refusing to disclose to the facility administration what he had discussed with his attorney during a legal visit; urinating and defecating on himself; refusing to be quiet; and "mouthing off" to staff.  J.B. has been in isolation for time periods ranging from a few hours to several days. When Defendants place J.B. in isolation, he is prohibited from participating in school, recreation, vocational programming and counseling.  He is socially isolated from his peers and generally spends the time sitting idly.  Defendants know that Plaintiff J.B. has a mental illness, has a history of engaging in self-injury, has borderline intellectual functioning, has experienced hallucinations and is at risk for suicide, but have confined him in isolation.

59.     While held in isolation, J.B. has, on several occasions, banged his head against the wall, bitten himself and attempted to choke himself.  In response to J.B.'s self-injury while in

isolation, NFYDC staff has used force against him, forcing him to the ground, subjected him to wrist and leg restraints and pushed him face down onto the floor onto his stomach while restraining him.

60.     Defendants' actions are not appropriate forms of treatment or rehabilitation for a youth such as J.B. with severe emotional disabilities, mental illness, a history of trauma and borderline cognitive functioning.  Isolation is contraindicated for adolescents with mental illness, self-harming behaviors and actually exacerbates self-harming and aggressive behaviors. Defendants' punitive use of isolation, restraints and force against J.B. is a substantial departure from accepted professional judgment, practice or standards and violates his right to be free from unreasonable bodily restraint.

61.     As a result of the punitive conditions to which Defendants have subjected J.B. and their failure to provide appropriate rehabilitative treatment, Plaintiff J.B. has suffered an increase in self-harming behaviors, physical aggression, sickness, fear, anger, physical injuries, anxiety, trauma and depression.

62.     Plaintiff J.D. was placed into isolation at least 8 times for reasons that lack any legitimate objectives or rehabilitative purpose related to treatment.  Defendants confined J.D. to isolation for reasons such as: self-injurious behavior and in response to staff restraining him and using force against him.  J.D. has been in isolation for time periods ranging from one to several days.  During one instance while he was in isolation, J.D. was subjected to inappropriate force by staff and thrown to the ground.  When Defendants place J.D. in isolation, he is prohibited from participating in school, recreation, vocational programming and counseling.  He is socially isolated from his peers and generally spends the time sitting idly.  Defendants know that Plaintiff

J.D. has a mental illness, has a history of engaging in self-injury and is at risk for suicide, but have confined him in isolation.

63.     Defendants' actions are not appropriate forms of treatment or rehabilitation for a youth such as J.D. with severe mental illness, a history of self-injurious behavior, hallucinations and suicide risk.   Isolation is contraindicated for adolescents with mental illness and self-harming behaviors.  Isolation causes youth such as J.D. to re-live trauma and causes the exacerbation of symptoms of mental illness.  Defendants' punitive use of isolation against J.D. is a substantial departure from accepted professional judgment, practice or standards and violates his right to be free from unreasonable bodily restraint.

64.     As a result of the punitive conditions which Defendants have subjected J.D. to and their failure to provide appropriate rehabilitative treatment, Plaintiff J.D. has suffered increased self-injury, fear, insomnia, anger, anxiety, trauma and depression.

65.     In a less than three month time period since he arrived at the NFYDC, Plaintiff D.F. was placed into isolation at least 4 times for reasons that lack any legitimate objectives or rehabilitative purpose related to treatment. D.F. was placed into isolation as punishment for behavior that is a manifestation of his developmental disability, as a result of Defendants' failure to protect him from several physical assaults and verbal abuse by other youth and for not following staff instructions.  D.F. has been in isolation for time periods ranging from one to several days.  When Defendants place D.F. in isolation, he is prohibited from participating in school, recreation, reading, counseling and, instead, generally spends the time sitting idly. Defendants know that Plaintiff D.F. has major depression with psychotic features, conduct disorder, mild mental retardation, a history of engaging in self-injury, experienced hallucinations and was at risk for suicide, but have confined him in isolation.

66. Defendants' actions are not appropriate forms of treatment or rehabilitation for a youth such as D.F. with a developmental disability, major depression, a history of self-injurious behavior, hallucinations and risk for suicide. Isolation is contraindicated for adolescents with developmental disabilities, mental illness and self-harming behaviors. The isolation of D.F. causes the exacerbation of symptoms of mental illness and jeopardizes his safety due to his disabilities and cognitive limitations. Defendants' punitive use of isolation against D.F. is a substantial departure from accepted professional judgment, practice or standards and violates his right to be free from unreasonable bodily restraint.

67. As a result of the isolation to which D.F. has been subjected and Defendants' failure to provide appropriate rehabilitative treatment, Plaintiff D.F. has suffered fear, anger, anxiety, trauma, further social isolation and depression.

68. Plaintiffs, and members of the putative class, are confined to isolation as punishment for conduct that can be addressed through treatment. Defendants use isolation as a substitute for adequate psychiatric care and treatment and because of the failure to adequately train staff in addressing behavioral issues that may arise in carrying out the treatment plans for Plaintiffs and members of the putative class.

69. Defendants' repeated use of and the length of punitive confinement in isolation of youth, including Plaintiffs and members of the putative class, serves no rehabilitative purpose and is the direct and proximate cause of their emotional and physical harm and trauma, including: anger, fright, trauma, self-destructive behavior, aggression, depression and harm towards self and others.

70. Defendants' policy, practice and/or custom of isolating and segregating youth with mental illness in isolation is punitive and a substantial departure from accepted professional

judgment, practice or standards.  Defendants' actions and inactions deprive Plaintiffs, and members of the putative class, of their right to treatment, rehabilitation and to be free from unreasonable bodily restraints.

71.     Although the facility was previously prohibited under a consent decree in 1987 from the use of punitive segregation, isolation or separation of youth in units/areas separate from the general population and prohibited from using such units or areas in the future, Defendants have, once again, returned to their old ways.

72.     Under DJJ policy, Defendant Cantrell must approve every youth placement into isolation at NFYDC.  Rules 63E-7.009(5)(a), 63E-7.013(16)(b) & 7.013(16)(j), Fla. Admin. Code.  Defendant Cantrell approved the placement of Plaintiffs, and members of the putative class, into isolation.  Defendant Cantrell is responsible for taking any corrective actions necessary to prevent the potential misuse or abuse of isolation.  He has failed to do so.

73.     Defendant Walters, as the Secretary of DJJ, has failed to ensure that the NFYDC policies, programs and services concerning the use of isolation are implemented according to constitutional standards.

74.     Defendants' failure to adequately train and supervise NFYDC staff to address the treatment needs of youth with mental illness and developmental disabilities has resulted in the staff use of isolation, force and restraints in response to behavior that should be addressed through an effective behavior management system and as part of a youth's treatment. Defendants' policy and/or practice of utilizing isolation, force and restraints in lieu of treatment creates unsafe conditions for Plaintiffs, and members of the putative class, and is a substantial departure from accepted professional judgment, practice or standards.

75.     DJJ facility reviews for Dozier and JJOCC have documented the need for appropriate supervision and training for staff who engage in inappropriate uses of force and isolation.  Reviews have noted the need for staff supervision and training concerning the use of isolation, restraints and inappropriate force because of: falsified and incomplete documentation; failure of program management to demonstrate knowledge and compliance with the requirements of using isolation; inconsistencies about whether youth were placed into isolation in locked rooms; failure to review isolation placements within required timeframes; failure to conduct required trainings for the facilities' behavior management system; failure to conduct safety and health checks; and failure to state the length of time a youth was isolated.  In addition, DJJ's own consultant informed Defendants that there was a need for in-service training for staff, including working with special needs juveniles; a need for a major training initiative for the facility's behavior management program; and that facility training was not based on a care-giving therapeutic and rehabilitative model, but rather, a detention based model.

### Inadequate Treatment for Youth at Risk of Suicide

76.     Defendants' mental health treatment is also inadequate to meet the needs of youth at risk for suicide and who engage in self-harming behaviors.  Defendants' policies, practices and/or customs not only fail to meet Plaintiffs' mental health needs in this critical area, but, instead, promote isolation and unsafe conditions for Plaintiffs, and similarly situated youth, which causes them to regress, not progress, in their rehabilitation.

77.     Defendants provide crisis management through suicide risk observation, but fail to provide adequate rehabilitative treatment for youth at risk of suicide, who engage in self-harm or who vocalize thoughts of self-injury.  Youth are placed on suicide risk observation in response to behaviors such as: self-mutilation, banging on doors or walls, verbalizing thoughts of self-

harm or harm to others, yelling or other behavior which is related to their mental illness or developmental disabilities. Defendants' suicide risk observation policy and/or practice requires a youth to pull their bare mattress outside the doorway of his room.  He is forced to sleep there at all times so a staff member assigned to the youth's living area can see him.  A youth remains on this status until a counseling supervisor approves his removal.

78.     Youth at the NFYDC, including the Plaintiffs, and members of the putative class, are left on suicide risk observation for days or months at a time and are isolated from the general population.  They are deprived of regular programming, including the opportunity to attend school, physical recreation, participate in therapy or participate in vocational training programs.

79.     Youth on suicide risk observation are also subject to isolation, humiliation, embarrassment, harassment and fear as a direct result of Defendants' policies and practices concerning suicide risk observation.  Defendants require Plaintiffs, and similarly situated youth, to wear a special bright yellow jumpsuit when they are on suicide risk observation.  Plaintiffs, and similarly situated youth, must remain on their mattresses outside their rooms and are subjected to ridicule and harassment by other youth who reside in their common living area, including having objects thrown at them.  When youth engage in repeated acts of self-injury, they are required to remain in the facility's medical area in only their underwear, sometimes only covered by what the youth refer to as the "turtle suit," a velcro-fastened plastic suit which covers only part of the front and back of their bodies.  Defendants' suicide risk policies, practices and/or customs are also used for youth who are placed in isolation.

80.     To avoid the embarrassment, humiliation and fear of physical abuse that comes from being on suicide risk observation, youths are known to falsely tell staff that they are no

longer experiencing hallucinations, suicidal thoughts and no longer wish to harm themselves so that they can escape this situation.

81.     NFYDC staff use inappropriate and excessive force, rather than behavioral intervention strategies, as part of treatment against youth in instances where youth engage in self-harm.  For example, during several instances where Plaintiff J.B. wrapped a sheet around his neck and attempted to strangle himself, attempted to choke himself with his hands and banged his head on walls and doors, multiple staff consistently used a "take down" restraint which forced J.B. prone onto the ground.  J.B. weighs only 120 pounds. Staff also frequently use mechanical restraints on J.B. in these instances by handcuffing his legs and arms.  These uses of force against J.B. are routine responses to his self-harming behaviors and punishment for J.B. exhibiting behaviors that are symptoms of his mental illness. J.B. has suffered as a result of these restraints, including experiencing: abrasions, bruises, anxiety, depression, physical illness and exacerbation of existing trauma.

82.     Youth are rarely provided visits with the psychiatrist during any time other than a pre-scheduled monthly visit even in instances where a youth engages in a suicide attempt, act of self-mutilation/self-injury or vocalizes suicidal thoughts.

83.     Defendants also fail to provide appropriate follow-up assessments for the named Plaintiffs, and similarly situated youth, after they are placed on suicide risk observation status. Defendants lack any policies or procedures which require that youth who are placed on suicide risk observation be assessed on any particular schedule.  This policy failure allows for arbitrary discretion, leaves youth on suicide observation for periods longer than needed, or places them at risk of not being assessed for more serious needs.  Youth placed on suicide risk observation status also do not receive additional counseling, psychiatric services or adequate modifications, if

any, to their treatment plans related to these specific behaviors after they are discharged from observation.

84.     Defendants' policies, practices and/or customs concerning the treatment of youth at risk for suicide have the effect of exacerbating, not preventing, self-harm behaviors and unreasonably risk the safety of youth with serious mental illness.  Defendants' policies, practices and/or customs concerning youth at risk for suicide affect all members of the putative class.

85.     Plaintiff J.B. has engaged in multiple acts of self-harm while at NFYDC, including choking himself, carving into his body, banging his head against objects and attempting to hang himself with a sheet around his neck.  He has experienced auditory hallucinations.  J.B. has been put into a yellow jumper and placed on suicide risk observation numerous times by Defendants Cantrell and Harrison for periods ranging from days to weeks since he has been at NFYDC.  J.B. was also required on two occasions to remain on suicide risk observation for days in a very cold isolation room in the facility's medical area in only his underwear.  J.B.'s treatment plan fails to mention or develop any goals or strategies related to any of repeated self-injurious conduct, suicidal behaviors and suicidal ideations that J.B. has had almost the entire time he has been at NFYDC.

86.     In July and August of 2010, one of J.B.'s counselors asked him to agree to a "contract" that he would not harm himself.  As a matter of professional judgment practice or standards, such "contracts" are deemed to have no clinical significance and should not be relied upon.   Since J.B. continued to engage in self-harming behaviors after his counselor tried to make this agreement, obviously, a better strategy for treatment was needed that was grounded in accepted professional judgment, practices and standards.

87.     Plaintiff J.D. has engaged in self-harm and suicidal behaviors several times while at NFYDC, including stabbing himself down the throat twice with a pencil, stabbing himself in the arm with a pencil, ingesting foreign objects and stabbing himself in the arm with a piece of a desk.  These acts resulted in physical injury required medical attention and hospitalization.  Less than two months after J.D. arrived at NFYDC, he began experiencing auditory hallucinations which direct him to harm himself and others.  These hallucinations are ongoing.  J.D. has been placed on suicide risk observation approximately 17 times at the NFYDC for periods ranging from a few days to over a month.  Each time, J.D. is required to wear a yellow jumper, pull his mattress into his doorway and sleep there.  J.D. began being placed on suicide risk observation the month that he arrived at the NFYDC and was rarely off suicide risk observation until January 2010 when these placements became less frequent.  While on suicide risk observation, other youth verbally harass J.D. and throw objects at him.

88.     For approximately a year while he was experiencing these symptoms and suicidal behaviors, J.D.'s treatment plans consistently failed to or include any specific objectives and interventions to adequately address these specific instances and behaviors.  It was not until August 2010 that Defendants added an objective in J.D.'s treatment plan which recognized that he was engaging in self-harm. This objective failed to address any of the very serious behaviors that had preceded it and proved to be ineffective.  After August 2010, J.D. continued to engage in self-injury, including ingesting objects such as rocks.  Defendants continued to place him on suicide observation and made no revisions to his treatment plan.

89.     Defendants' policies, practices and inactions concerning J.B. and J.D.'s acts of self-injury and risks for suicide have increased their behaviors, exacerbated their symptoms of mental illness, created unsafe conditions for them and failed to meet their treatment needs.

Plaintiffs who engage in self-harm and suicidal behaviors, including named Plaintiffs J.D. and J.B., do not have treatment plans or any other aspect of individualized counseling which develops, monitors and amends adequately therapeutic objectives and strategies to addresses and change these behaviors.

90.     Defendants' failure to provide Plaintiffs, and members of the putative class, with such treatment is a substantial departure from accepted professional judgment, practice or standards in violation of their due process rights.  Defendants' omissions are the direct and proximate cause of emotional and physical harm and trauma for Plaintiffs and members of the putative class, including repeated acts of self-injury and mutilation, depression, anxiety and reduces the likelihood of successful integration into the community.

### Violation of Due Process Rights Concerning Programming

91.     Juveniles have a right to be provided with an adequate level of programming to have a reasonable opportunity to accomplish the purpose of their confinement and contribute to their ability to succeed in the community upon release from DJJ and the NFYDC.

92.     Defendants Cantrell and Walters' policy, practice and/or custom precludes all youth who are in custody at the closed campus of NFYDC from participating in an adequate level of programming.  Defendants prohibit Plaintiffs, including Plaintiff J.D. and Plaintiff J.B. (while he was in custody at the NFYDC closed campus) who are in custody at the closed campus of the NFYDC, from participating in any of the programs which provide job skills training or other vocational programming opportunities such as the Home Builders Institute, masonry, FETCH (dog training), auto mechanics and horticulture.  Youth at the closed campus of the NFYDC are not provided any procedure to challenge this policy, practice and/or custom.

93.    Defendant Cantrell and Walter's refusal to permit Plaintiffs to participate in these job skills training and vocational programs violates their due process rights, and the rights of similarly situated youths, to participate in adequate programming as part of their rehabilitative goals.  Defendants' decision to deny Plaintiffs participation in this programming has no reasonable relationship to any legitimate objectives.

## CLAIMS FOR RELIEF

### COUNT I

**Due Process Pursuant to 42 U.S.C. § 1983**
**Defendants Walters, Cantrell and Harrison**

94.    Paragraphs 1 through 90 are incorporated herein as if fully set forth.

95.    This count is brought pursuant to 42 U.S.C. § 1983.  At all times relevant to this action, Defendants have acted under color of state law.

96.    The conditions of confinement at NFDYC and Defendants' policies, practices, customs, acts and omissions complained of herein have failed to provide Plaintiffs, and the class they seek to represent, with adequate mental health treatment, constitute punishment and subject them to denial of due process of law in violation of their rights under the Fourteenth Amendment to the United States Constitution.

97.    The conditions of confinement at NFYDC and Defendants' policies, practices, customs, acts and omissions complained of herein are a substantial departure from accepted professional judgment, standards and practices and subject Plaintiffs, and the class they seek to represent, to a denial of due process of law in violation of their rights under the Fourteenth Amendment to the United States Constitution.

98.    Plaintiffs, and the class they seek to represent, have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate

result of Defendants' violations of their rights under the Fourteenth Amendment to the United

States Constitution and 42 U.S.C. § 1983. Plaintiffs, and the class they seek to represent, will

continue to suffer irreparable injuries from the conditions of confinement at NFYDC and

Defendants' policies, practices, acts and omissions.

## COUNT II

### Due Process Pursuant to 42 U.S.C. § 1983
### Defendants Walters and Cantrell

99.     Paragraphs 1 through 30 and 91 to 93 are incorporated herein as if fully set forth.

100.    This count is brought pursuant to 42 U.S.C. § 1983. At all times relevant to this

action, Defendants have acted under color of state law.

101.    Defendant Walters' and Cantrell's policies, practices, customs, acts and omissions

complained of herein have deprived Plaintiffs, and the class they seek to represent, of the right to

participate in an adequate level of programming and a reasonable opportunity to accomplish the

rehabilitative purpose of their confinement at NFYDC in violation of their rights under the

Fourteenth Amendment to the United States Constitution.

102.    Plaintiffs, and the class they seek to represent, have suffered harm and will

continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate

result of Defendants' violations of Plaintiffs' rights under the Fourteenth Amendment to the

United States Constitution and 42 U.S.C. § 1983. Plaintiffs, and the class they seek to represent,

will continue to suffer irreparable injuries from the conditions of confinement at NFYDC and

Defendants' policies, practices, acts and omissions.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Certify this action as a class action;

B.      Permit the named Plaintiffs to proceed using pseudonyms;

C.      Declare that Defendants have violated the due process rights of Plaintiffs, and the class members, under the Fourteenth Amendment to the United States Constitution by subjecting Plaintiffs, and members of the class, to the policies, practices and conditions of confinement described herein;

D.      Permanently enjoin Defendants, their agents, employees, successors and all other persons acting in concert or participation with them from engaging in the unlawful acts described herein;

E.      Retain jurisdiction over Defendants until such time as the Court is satisfied that the unlawful policies, practices, acts and omissions complained of herein no longer exist and will not recur;

F.      Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

G.      Grant such other and further relief as this Court deems just and proper.


                                Respectfully submitted,


                        By:    s/ Andrea Costello
                                Andrea Costello
                                Florida Bar No.: 532991


                                Christopher M. Jones
                                Florida Bar No.: 994642

                                Kristen Cooley Lentz
                                Florida Bar No.: 649635

                                Peter P. Sleasman
                                Florida Bar No.: 367931

Florida Institutional Legal Services, Inc.
14260 W. Newberry Road - #412
Newberry, FL 32669
(352) 375-2494, ext. 1012
(352) 331-5202 (fax)
acostello@filsinc.org
cjones@filsinc.org
klentz@filsinc.org
psleasman@filsinc.org


Amy Guinan
Florida Bar No.: 146897
Florida Legal Services, Inc.
2425 Torreya Drive
Tallahassee, FL 32303
(850) 385-7900
(850) 385-9998
amy@floridalegal.org

ATTORNEYS FOR PLAINTIFFS


Dated:  February 25, 2011